IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOSEPH F. COHN,

       **Plaintiff,**

vs.                                                    No.  02cv0971 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

       **Defendant.**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's (Cohn's) Motion to Reverse and Remand for a Rehearing **[Doc. No. 13]**, filed June 9, 2003, and fully briefed on July 7, 2003.  The Commissioner of Social Security issued a final decision denying Cohn's application for disability insurance benefits and supplemental security income.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is well taken and will be GRANTED.

### I.  Factual and Procedural Background

Cohn, now forty-four years old, filed his application for disability insurance benefits on April 14, 1999, and for supplemental security income on March 15, 1999, alleging disability since February 27, 1999, due to left posterior tibial neuralgia and deep vein thrombosis. Tr. 25.  Cohn has an eleventh grade education and past relevant work as a heavy equipment operator and labor carpenter.  Tr. 21. On October 27, 2000, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding that Cohn's left posterior tibial neuralgia and deep vein thrombosis were

severe impairments but did not "meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." Tr. 25-26. The ALJ further found Cohn retained the residual functional capacity (RFC) to perform "a full range of sedentary work." Tr. 26. As to his credibility, the ALJ found that Cohn's allegations regarding his limitations were "not totally credible." *Id.* Cohn filed a Request for Review of the decision by the Appeals Council. On October 27, 2000, the Appeals Council denied Cohn's request for review of the ALJ's decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Cohn seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II. Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative

evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse, Cohn makes the following arguments: (1) the ALJ's reliance on the Medical-Vocational Guidelines (the grids) to find him not disabled is contrary to law; (2) the ALJ's credibility determination is not supported by the evidence and is contrary to law; and (3) the ALJ failed to discuss or consider his treating physician's opinion that he is disabled.

### A.  Reliance on the Grids

The Commissioner has the burden at step five of the sequential evaluation process to show that the claimant can perform other jobs presently existing in the national economy. *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir. 1989). The Commissioner meets this burden by first referring to the grids. *See Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984). The grids represent the Commissioner's administrative notice of the jobs that exist in the national economy at the various functional levels (i.e. sedentary, light, medium, heavy, and very heavy). *Id.* If the ALJ's findings of fact regarding a particular individual's age, education, training, and residual functional capacity (RFC) all coincide with the criteria of a particular rule on the grids, the Commissioner must conclude that jobs suitable for the claimant exist in the national economy and that the claimant therefore is not disabled. *Id.*

As a general rule, the grids should not be applied conclusively "unless the claimant could perform the full range of work required of [the pertinent RFC] category on a daily basis and unless the claimant possesses the physical capabilities to perform most of the jobs in that range." *Ragland v. Shalala*, 992 F.2d 1056, 1058 (10th Cir. 1993)(quoting *Hargis v. Sullivan,* 945 F.2d

1482, 1490). "[R]esort to the grids is particularly inappropriate when evaluating nonexertional limitations such as pain." *Id.* The grids may, however, be used to direct a conclusion if the claimant's nonexertional impairments do not significantly reduce the underlying job base. *See Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995)(holding that the ability to perform a "substantial majority" of work in RFC assessment suffices for purposes of the grids). This is because only significant nonexertional impairments limit the claimant's ability to do the full range of work within a classification. *See Thompson*, 987 F.2d at 1488.

Cohen contends the ALJ erred in relying on the grids to determine that he was not disabled under the Social Security Act. The ALJ found Cohn's age, education, training, and residual functional capacity (RFC) all coincided with grid rule No. 201.25 and thus found him not disabled. Tr. 25. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 2, Table No. 1, Rule 201.25. Cohn argues this was error because the ALJ failed to consider his nonexertional impairments, ie., his pain and mental impairment.

In terms of Cohn's allegations of pain, the ALJ concluded there was "no evidence of pain serious enough to significantly limit Mr. Cohn's ability to perform a full range of sedentary work." Tr. 24. The ALJ found as follows:

> It is noteworthy that when Mr. Cohn had a neurological consultation, his good self-report of how effective Prozac had been in alleviating pain symptoms apparently changed. Mr. Cohn also told neurologist P. Jain, M.D., that he had twisted his back and continued to have pain associated with his left knee and calf. However, upon examination, Mr. Cohn's left leg had no palpable tenderness in the knee, left calf or left foot. The examining physician assigned a diagnosis of posterior tibial nerve neuralgia with left leg sharp shooting pain which was "not relieved by Prozac or narcotic medications." This seems inconsistent with his and Ms. Cohn's report to Dr. Skee that Prozac had been "of major benefit to him." More troubling is Dr. Skee's later comment in response to Mr. Cohn's continued presentation with left leg pain: Dr. Skee stated that the left leg pain had been a debilitating symptom for Mr. Cohn with no clear explanation after having been evaluated by a neurologist, (himself) and orthopaedist.

5

>Furthermore, the claimant underwent a vascular diagnostic evaluation at the direction of Dr. Jain, which revealed mild arterial insufficiency to the right popliteal.  In addition, an evaluation of the claimant's lumbar spine revealed only mild degenerative changes without disc herniation or neural foraminal stenosis.  Moreover, Mr. Cohn's testimony failed to persuade me that his left leg pain has caused his alleged degree of functional loss.
>
>He testified that he has swelling and crushed nerves in his left leg.  He stated that it always hurts and that he must try to keep it elevated most of the time to relieve the pressure on it.  He feels constant tingling in his toes.  He uses a TENS unit most always, which he acknowledged was somewhat helpful.  He stated that is (sic) hip is 'going out' and that he is getting arthritis in his spine.  He does not drive and when he goes shopping with his wife, he remains in the car.  He said that he is unable to stand for more than five minutes; that when he is not lying down in bed, he is usually lying down with his leg elevated.  Overall, he stated that he is inactive and cannot participate in household chores.  He stated that he could not squat or climb a ladder.
>
>In respect to the claimant's credibility, I find that Mr. Cohn's allegations were not totally substantiated.  He gave conflicting evidence regarding the effectiveness of Prozac and on more than one occasion he displayed inordinate pain responses incommensurate with normal examination techniques.
>
>In considering all the evidence heretofore discussed, I have found no evidence of pain serious enough to significantly limit Mr. Cohn's ability to perform a full range of sedentary work.  The objective findings generally reflect that he sustained an injury to his left leg which ultimately produced a deep venous thrombosis behind his left knee.  He required anticoagulants, experienced a side complication with internal hemorrhoids, and was ordered to cease using blood-thinning medications.  Nonetheless, the claimant continued to complain of debilitating pain, although both he and his wife definitively admitted that Prozac had been a major benefit in the treatment of pain symptoms.
>
>Reduced to its simplest expression, the analysis of this case turns on Mr. Cohn's failure to satisfy the first step of the well-known tripartite test established in <u>Luna v. Bowen</u>, 834 F.2d 161 (10th Cir. 1987) and SSR 96-7p: the evidence simply does not establish the existence of a medically-demonstrated impairment capable of causing the pain Mr. Cohn describes.  Without that predicate, I cannot accord any real weight to his complaints of disabling pain.

Tr. 23-24.  The ALJ's finding that "the evidence simply does not establish the existence of a medically-demonstrated impairment capable of causing the pain Mr. Cohn describes" is not supported by the record.  Sometime in January1999, Cohn suffered a hard blow to the posterior aspect of his left knee. Tr. 120.  On February 28, 1999, Cohn was admitted to Gila Regional Medical Center for a deep vein thrombosis.  *Id.*  At that time, Dr. John Stanley, a family

practitioner, examined Cohn and found tenderness in the medial thigh on the left extremity. Cohn also had some erythema, a positive Homans'[1] sign, calf tenderness, and slight swelling of the left lower leg. Dr. Stanley treated Cohn with anticoagulants and discharged Cohn on March 10, 1999. Tr. 121.

Although Cohn continued to receive his care from Dr. Stanley, on March 25, 1999, he sought a second opinion from Dr. John Baca, an internist at Lovelace Health Services Systems in Albuquerque. Tr. 135-137. Dr. Baca reviewed Cohn's medical records and found Cohn was "therapeutic on Comadin." Tr. 135. Cohn informed Dr. Baca that the swelling in the left leg had "subsided substantially, but he still [had] periodic pain in the medial left thigh and posterior knee." *Id.* Dr. Baca repeated the doppler scan of the left lower extremity and advised Cohn to continue his course of Coumadin as directed by Dr. Stanley. Tr. 136. The doppler scan indicated "evidence of thrombophlebitis in the deep veins of the left calf extending into the popliteal and superficial femoral vein of the left leg" and "also evidence of superficial thrombophlebitis in the lesser saphenous vein." Tr. 133. Dr. Baca also opined Cohn "should be able to get disability for this medical problem as it clearly puts him at high risk of on-the-job injury and complications." Tr. 137.

On July 7, 1999, Cohn sought another opinion from Dr. Lesley W. Janis, an internist. Tr. 179-180. Dr. Janis noted Cohn was very concerned about the deep vein thrombosis and with recurrence. *Id.* At that time, Cohn was still on Coumadin and pain medication. Dr. Janis performed a physical examination and noted no clubbing, cyanosis, edema and a negative

---

[1] Homans' sign is slight pain at the back of the knee or calf when the ankle is slowly and gently dorsiflexed (with the knee bent), indicative of incipient or established thrombosis in the veins of the leg. *Stedman's Medical Dictionary* 1617 (26th ed. 1995).

Homans' sign.  *Id.*  Dr. Janis recommended continuing treating Cohn with Coumadin for a total of six months and then discontinuing it.  Tr. 180.

On August 23, 1999, Cohn returned to see Dr. Janis for continued left leg swelling and pain behind the knee.  Tr. 226.  Cohn also complained of right elbow pain.  Other than mild pain in the ulnar groove, Dr. Janis noted Cohn's physical examination was unremarkable.  Dr. Janis assessed Cohn with postphlebitic syndrome.  *Id.*  Dr. Janis recommended Cohn continue the Coumadin for three more weeks and then discontinue it.  Dr. Janis also referred Cohn for physical therapy evaluation for chronic pain management.  Significantly, Dr. Janis noted "I am very concerned that he is headed toward a disabled mode at this point."  *Id.*

On September 15, 1999, Cohn sought an opinion from Dr. James R. Skee.  Tr. 224.  Dr. Skee noted Cohn's history, specifically that Dr. Janis had suggested to Cohn to stop the Coumadin, but Cohn was "petrified of stopping it."  *Id.*  Dr. Skee's physical examination indicated no edema in the left lower extremity and "diminished pinprick very definitely in the left foot compared to the right foot."  *Id.*  Dr. Skee also noted "[e]very once in a while he just winces from pain and move uncomfortably when he gets paroxysms of pain going down his left leg."  *Id.*  Dr. Skee opined the pain sounded "more neuropathic than DVTs" and referred him to Dr. Anna Vigil, a neurologist.  Dr. Skee also started Cohn on Amitriptyline (tricyclic antidepressant) 25 mg, increasing to 50 mg at bedtime.

On October 28, 1999, Dr. Skee noted that Cohn had missed his last two scheduled appointments.  Tr. 222.  Cohn informed Dr. Skee that he had seen Dr. Vigil, and she did not think his problem was neurologic but suggested an orthopaedic referral.  *Id.*  Cohn reported the

Amitriptyline helped him "sleep better from the pain in his left leg." *Id.* Dr. Skee examined Cohn and noted "Leg is unremarkable." *Id.* Dr. Skee referred Cohn to Dr. Robinson, an orthopaedist.

On November 11, 1999, Cohn returned to see Dr. Skee with complaints of malaise and fatigue. Tr. 220. Cohn also complained of pain in the left leg. Cohn reported having "a lack of energy, a lack of motivation and a short fuse." *Id.* Dr. Skee discussed the possibility of depression with Cohn and prescribed Prozac 20 mg and discontinued the Amitriptyline. However, Dr. Skee continued the Coumadin.

On November 16, 1999, Dr. Robinson evaluated Cohn. Tr. 233. Dr. Robinson's examination of Cohn's left knee was essentially negative. *Id.* The knee x-rays demonstrated no evidence of osteoarthritis and no evidence of previous fracture. Dr. Robinson's impression was that it could be a "possible meniscus tear with underlying DVT." *Id.* Dr. Robinson did not believe Cohn's continued pain was "referable to his clot." *Id.* Dr. Robinson ordered an MRI.

On November 30, 1999, Cohn returned for a follow-up visit with Dr. Robinson. Tr. 234. The MRI was negative for meniscal tear or ligament injury. Dr. Robinson referred Cohn to physical therapy to begin working on some strengthening to his left lower extremity. *Id.*

On December 9, 1999, Cohn returned to see Dr. Skee. Tr. 216. Cohn complained of malaise and fatigue. Dr. Skee noted Dr. Robinson's findings and his recommendation for physical therapy. Dr. Skee noted that Cohn and Cohn's wife reported improvement of his pain with Prozac. *Id.* The physical examination was essentially normal. Dr. Skee discontinued the Coumadin and instructed Cohn to continue with the Prozac 20 mg daily. Dr. Skee directed Cohn to return in three weeks so Dr. Skee could evaluate how Cohn was doing off the Coumadin.

9

On December 16, 1999, Cohn was seen in the emergency room of the Gila Regional Medical Center. Tr. 213. Cohn complained of bloody stools. The physician prescribed Ativan and vitamin K and admitted him. *Id.* Dr. Samuel Dye evaluated Cohn the following day. Tr. 207-208. Dr. Dye noted Cohn had been "very worked up and excited" at the emergency room. Dr. Dye noted an "[i]nordinate amount of jumping around the bed and yelling as far as me just doing a rectal. I got the same reaction we (sic) I attempted to examine the posterior aspect of his left leg." *Id.* Dr. Dye diagnosed Cohn with lower GI bleeding, presumed secondary to internal hemorrhoids, history of DVT of the left leg with "now a much poor[er] functioning level than is warranted by the actual problems going on." *Id.* Dr. Dye opined Cohn had "a form of posttraumatic stress disorder with somatization." *Id.* Dr. Dye noted Cohn "may need some psychotherapy." *Id.* Dr. Dye discharged Cohn on December 17, 1999. The discharge diagnoses were (1) lower gastrointestinal bleeding, secondary to hemorrhoids; (2) chronic leg pain, post clot with somatization; and (3) posttraumatic stress. *Id.*

On December 23, 1999, Cohn returned to see Dr. Skee for a follow-up of his hemorrhoids. Tr. 202-203. Dr. Skee noted Cohn was still on Coumadin when he went to the emergency room but had since discontinued it. Cohn also complained of left leg pain. Dr. Skee noted "This has been a debilitating symptom for this patient with no clear explanation after seeing myself and the orthopaedist." *Id.* The physical examination was essentially normal. Dr. Skee advised Cohn to continue with the same treatment and ordered a Protime to ensure Cohn was off the Coumadin.

On January 20, 2000, Cohn returned to see Dr. Skee with complaints of pain in his left leg. Tr. 200. Dr. Skee noted Cohn had not received the physical therapy recommended by Dr.

Robinson. Dr. Skee opined the pain sounded "like it could be neuropathic." *Id.* Dr. Skee referred Cohn to Dr. Jain, a neurologist, and encouraged him to get the physical therapy recommended by Dr. Robinson.

On February 16, 2000, Cohn returned to see Dr. Skee. Tr. 199. Dr. Skee noted Cohn was now complaining of low back pain and "still not very active." *Id.* Dr. Skee's physical examination of both lower extremities was "completely unremarkable." *Id.* Dr. Skee indicated he would wait for Dr. Jain's recommendation and referred Cohn for physical therapy at Health South and opined that part of the problem was "just disuse at this point." *Id.*

On February 18, 2000, Dr. Pawan Jain, a neurologist, evaluated Cohn for left leg pain and back pain. Tr. 241-243. Dr. Jain's examination of Cohn's left lower extremity revealed no palpable tenderness in the left knee, left foot or left calf muscles. Tr. 242. Homans' sign was negative. Dorsalis pedis and posterior tibial artery pulsations were intact and no varicose veins were noted. *Id.* However, Dr. Jain found Cohn's left leg was reddened in comparison to his right leg and the left leg was icy cold in spite of Cohn wearing two socks and tall boots. *Id.* Dr. Jain diagnosed Cohn with posterior tibial nerve neuralgia.[2] Dr. Jain also opined that the "color change" in Cohn's left foot was suggestive of reflex sympathetic dystrophy[3] or neuralgia[4] that he

---

[2] Posterior tibial nerve neuralgia is a term usually referring to pain extending along the course of the posterior tibial nerve (neuralgia). *The Merck Manual* 487 (17th ed. 1999).

[3] Reflex sympathetic dystrophy is a chronic pain state induced by soft tissue or bone injury in which pain is associated with autonomic changes (e.g., sweating or vasomotor abnormalities) and /or trophic changes (e.g., skin or bone atrophy, hair loss, joint contractures). *The Merck Manual* 1372-73 (17th ed. 1999).

[4] Neuralgia is pain of a severe, throbbing, or stabbing character in the course or distribution of a nerve. *Stedman's Medical Dictionary* 1198 (26th ed. 1995).

probably sustained after his injury. *Id.* Dr. Jain ordered a lumbosacral MRI and a lower extremity venous-arterial doppler. *Id.* Dr. Jain prescribed Pamelor 25 mg (tricyclic antidepressant used to manage neuropathic pain) at bedtime and instructed Cohn to increase the dosage to 50 mg later in the week. *Id.*

On March 10, 2000, Dr. Jain noted that Cohn's condition was unchanged and he was still experiencing pain of his left leg and back. Tr. 239. Apparently, due to illness, Cohn had not complied with Dr. Jain's previous orders to undergo a lumbosacral MRI and lower extremity venous-arterial doppler. Dr. Jain prescribed Neurontin (anticonvulsant used to manage neuropathic pain) 300 mg three times a day for the left lower extremity burning pain and increased the dosage of Pamelor to 50 mg with instruction to increase the dose to 75 mg the following week. *Id.*

On March 31, 2000, Cohn returned for his follow-up visit with Dr. Jain. Tr. 236. Dr. Jain noted "I explained to the patient that so far most of the test are negative and he states that Neurontin does help his pain." Tr. 236. Dr. Jain diagnosed Cohn with left posterior tibial neuralgia. *Id.* Dr. Jain added Baclofen 5 mg three times a day for muscle spasms and decreased the dosage of Pamelor to 50 mg at night. Cohn informed Dr. Jain he was receiving physical therapy and using a TENS machine. Dr. Jain noted Cohn reported the TENS machine helped his pain. *Id.* Finally, Dr. Jain discussed the use of CT guided nerve block of the common peroneal nerve if the therapy prescribed failed. Dr. Jain directed Cohn to return for a follow-up visit in four to six weeks.

On August 4, 2000, Cohn returned to see Dr. Jain. Tr. 283. Cohn reported he was feeling better and expressed his desire to return to work. Dr. Jain encouraged Cohn to return to

work and noted he had no restrictions or reservations as to Cohn returning to work.  *Id.*  Dr. Jain also noted Cohn's condition, reflex sympathetic dystrophy, was a permanent condition but the current treatment helped relieve the pain.  *Id.*  However, on the same day, Dr. Jain wrote a "To Whom it May Concern" letter, indicating Cohn was disabled due to a left popliteal nerve injury and opined the problem "could be permanent."  Tr. 244.

On November 17, 2000, Cohn returned to see Dr. Jain because of a fall that aggravated his left leg pain.  Tr. 284.  Cohn reported having difficulty walking and described his pain as "shooting down from the popliteal area to the foot whenever he turned around or twists."  *Id.*  Dr. Jain increased the Neurontin to 400 mg in the morning, 400 mg in the afternoon and 600 mg in the evening.  Dr. Jain prescribed Tylenol No. 3, one tablet every four hours as needed for acute pain.  *Id.*  Dr. Jain also ordered a lower extremity doppler to rule out deep venous thrombosis because of the "engorged vein in the leg and foot."  *Id.*

On December 29, 2000, Dr. Jain noted a telephone call from Cohn.  Tr. 285.  Cohn reported he continued to have pain.  Dr. Jain noted Cohn's last doppler was normal.  Dr. Jain also noted Cohn's condition was chronic in nature, consisting mostly of burning and tingling pain that is aggravated by touch and physical activity.  *Id.*  Dr. Jain recommended Cohn receive a CT-guided nerve block.  Cohn requested a repeat nerve conduction and doppler studies because his legs were red all the time.  Dr. Jain scheduled Cohn for a carotid doppler, EMG, and nerve conduction studies for the following week.  *Id.*

On March 23, 2001, Dr. Jain examined Cohn.  Tr. 293.  Dr. Jain opined Cohn suffered from "right popliteal neuropathy below the junction of bifurcation of common peroneal nerve due to traumatic injury."  *Id.*  Cohn informed Dr. Jain that Pamelor, Neurontin and Temecin "just

control his pain." *Id.* Dr. Jain advised Cohn that the aim of treatment was to control the pain with medication. Dr. Jain placed Cohn on Neurontin 400 mg three times a day, Pamelor 25 mg at bedtime and Mexitil 150 mg twice a day, opining this was a strong combination of medication to control the pain. *Id.* Dr. Jain also advised Cohn he would recommend another pain clinic if Dr. Jain could not control his pain. Dr. Jain also suggested a nerve block for his pain since Cohn had tried "various modalities" except a nerve block. Dr. Jain diagnosed Cohn with reflex sympathetic dystrophy of the right popliteal nerve. Dr. Jain also advised Cohn that he would refer him to an anesthesiologist for a nerve block if his medications did not provide him any relief.

On June 14, 2001, Dr. Jain wrote a "To Whom it May Concern" letter. Tr. 288. In this letter, Dr. Jain wrote he had examined Cohn on March 23, 2001, at which time Cohn had an EMG. The EMG did not show any denervation. The EMG indicated mildly increased tenses of peroneal nerve but normal tenses in the tibial nerve. *Id.* Finally, the EMG indicated Cohn had axonal type of neuropathy. *Id.* Dr. Jain opined Cohn had right popliteal neuropathy. Dr. Jain noted that upon examination Cohn did not have foot drop or any kind of weakness, his muscles were healthy, intact and reflexes were normal except for the burning, sharp-shooting pain. *Id.* Dr. Jain's recommendation was control of the pain with medications and a TENS machine. Dr. Jain also indicated he would send Cohn for further pain management at another pain clinic if his pain continued.

On March 13, 2001, Dr. Jamelle Bowers examined Cohn. Tr. 309. Cohn complained of "continual pain in his left leg which is partially relieved by the TENS unit and the medication." *Id.* Cohn informed Dr. Bowers that he was "going for a spinal block to relieve the pain in that leg." *Id.* The physical examination of the extremities indicated Cohn had no cyanosis, clubbing or

14

edema. Dr. Bowers noted Cohn complained of chronic pain in his left leg with "any type of movement." *Id.* Dr. Bowers instructed Cohn to return in four to five months after his nerve block.

On June 8, 2001, Cohn returned for a follow-up visit for a severe right-sided headache and facial pain. Tr. 298. Cohn had been seen at the emergency room the previous night. Tr. 319-323. At that time, Cohn was using his TENS unit for his left leg pain. Dr. Bowers commented that "it seems as though some of this pain is psychosomatic." However, it is not clear from Dr. Bowers' notes whether he was referring to the right-sided headache and facial pain or his left leg pain.

On August 29, 2001, Cohn returned to see Dr. Bowers with complaints of "severe pain in his left lower extremity." Tr. 296. Dr. Bowers' examination of the left extremity was essentially negative except for "chronic pain even to the touch, on his left leg." *Id.* Dr. Bowers referred Cohn to Dr. Luckwitz for "a saddle block, or something, or maybe even a more local block that can relieve some of that pain." *Id.* Dr. Bowers also refilled Cohn's medications and instructed him to come back in two to three months.

On March 30, 2002, Cohn was admitted to Gila Regional Medical Center for a swollen, painful left leg. Tr. 358. Dr. Dye diagnosed Cohn with "a new extensive clot" of the left leg. On examination, Dr. Dye noted "This man winces violently at times. At other times with movement, at other times he moves around with[out] any demonstration of pain whatsoever." *Id.* Dr. Dye noted "minimal swelling and exaggerated tenderness in the left leg." *Id.* Dr. Dye diagnosed Cohn with thrombophlebitis of the left leg and posttraumatic neuropathy.

On April 1, 2002, Cohn returned to see Dr. Dye. Tr. 361. Dr. Dye noted that Cohn was "sitting crying because of the pain in the leg." *Id.* Dr. Dye went on to comment that Cohn had "always been overreactive (sic) as far as pain sensation in his legs." *Id.* Dr. Dye also noted that when Cohn was distracted he did just fine. Dr. Dye prescribed Lovenox (used for the treatment of deep vein thrombosis) and directed that home health care services be provided for Cohn so that he could receive the Lovenox at home. Tr. 361.

There is ample evidence in the record of a "medically-demonstrated impairment" responsible for the pain Cohn reports. Nonetheless, in order to qualify as disabling, pain must be severe enough– either by itself or in combination with other impairments– to preclude any substantially gainful employment. *See Brown v. Bowen*, 801 F.2d 361, 362-63 (10th Cir. 1986). On remand, the ALJ should evaluate Cohn's pain pursuant to *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987), and determine if in fact the pain is disabling. Because Cohn has established a nonexertional limitation, i.e., pain, the ALJ may be precluded from conclusively relying on the grids if he finds it significantly reduces the underlying job base. If so, the ALJ must consult with a vocational expert. The ALJ also should consider whether a psychological or psychiatric consultation is necessary to rule out somatization as suggested by Dr. Dye.

Finally, the ALJ should explain why he rejected Dr. Jain's opinion that Cohn was permanently disabled. The ALJ must "give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record." *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001). A treating physician's opinion is considered in relation to factors such as its consistency with other evidence, the length and nature of the treatment relationship, the frequency of examination, and the extent to which the opinion is

supported by objective medical evidence. 20 C.F.R. § 404.1527(d) (1)-(6). If the physician's opinion is "brief, conclusory and unsupported by medical evidence," that opinion may be rejected. *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988). In this case, the Court notes that on the same day Dr. Jain opined Cohn was disabled, he also noted he had no restrictions or reservations as to Cohn returning to work. Tr. 244, 283. Moreover, a treating physician's opinion that a claimant is totally disabled is not dispositive "because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]." *Castellano v. Secretary of Health & Human Servs.,* 26 F.3d 1027, 1029 (10th Cir. 1994).

The Commissioner argues that failure to follow a prescribed course of treatment that could restore the ability to work is grounds to deny benefits. Resp. to Mot. to Reverse and Remand at 5. The record indicates that Cohn failed to adhere to his treating physicians' recommendations that he receive physical therapy. However, this was not the basis for the ALJ's finding that Cohn was not disabled. On remand, the ALJ may consider Cohn's failure to follow prescribed treatment. The Court expresses no opinion as to the extent of Cohn's impairments, or whether he is or is not disabled within the meaning of the Social Security Act. The Court does not require any result. This remand simply assures that the ALJ applies the correct legal standards in reaching a decision based on the facts of the case.

**NOW, THEREFORE,**

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Reverse and Remand for a Rehearing **[Doc. No. 13]**, is granted. This matter is remanded to allow the ALJ to evaluate Cohn's pain pursuant to *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987), reconsider whether it is appropriate to conclusively rely on the grids and consult a vocational expert if necessary. The

ALJ also should consider whether a psychological or psychiatric evaluation is necessary. Finally, the ALJ shall explain why he rejected Dr. Jain's medical opinion that Cohn was permanently disabled.

    A judgment in accordance with this Memorandum Opinion and Order will be entered.

 

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**